Good morning, Your Honors. My name is Roger Flynn, and I represent the Western Shoshone Tribes and other appellants in this case. The case is about one of the largest gold mines ever proposed on our public lands in the United States history, Cortez Hills Project. It's a massive mine, a 2,000-foot-deep mine pit that will never be reclaimed, a processing facility using toxic cyanide known as a heat bleaching process, the dumping of over 1.5 billion tons, a billion tons of mine waste on our public lands, and the removal, the pumping, or dewatering of over 16.5 billion gallons of water. All this will occur in a very special and unique place in the West, Mount Denebo. A place of immense religious significance to numerous Western Shoshone tribes, tribes that have lived in this area since time immemorial, and to many Western Shoshone individuals, a place used for countless generations for prayer and communion with their creator. These uses will be eliminated, and in fact are being eliminated as we speak each day by the Cortez Hills Project. Because this case involves a preliminary injunction, the first place we look is the irreparable harm. We think the harm is clear. The district court stated that it did not question the irreparable harm from the project. I mean, it's actually, if you've ever been to one of these mines, it's hard to imagine anything more destructive or harmful to the public lands than one of these gigantic open-pit cyanide heat-bleaching mine. The irreparable harm of the project is clear. And I think that's what we're going to look at in the long run, but what about in the short run? What's the status of things now? Right. And I think barrack attorneys may have some pictures to that. The mine started immediately after it was issued. We moved for a TRO. We worked out a deal where it would start slowly, but the preliminary injunction was denied at the end of January by Judge Hicks. And from that moment on, particularly, it started early in December, but from late January, they had been going around the clock, bulldozing road construction, building the cyanide facility, starting to move the waste around. And I know barrack has stressed a lot that, it's interesting, when we moved for the TRO just days after the mine was approved, they said, there'll be no irreparable harm in the short term. And when we have the preliminary injunction hearing in January, still no irreparable harm. And now they're saying, once again, for the next six months or a year, whenever, we just got the administrative record the other day, this case is going to take a while. They're saying that it's still no irreparable harm. If you look at some of the photos that they inserted in their supplemental excerpts of record, this project is ongoing. In fact, in the beginning of their briefs, they talk about the need for immediate development of the mine pit. Now, the mine pit, the 2,000 foot pit that's going to fill up with arsenic contaminated water, is not going to reach full depth. And the groundwater dewatering, which will start in the second year of the project, isn't going to happen, you know, the full scale isn't going to happen for 10 years. Now, help me with this. We expedited it. We denied it preliminary. We denied the injunction, TRO, whatever. The injunction, but we, for this day. But we expedited and appealed. Right. Now, the work started when? Well, it started in November, right when we filed the lawsuit. The mine was approved November 12th. And then it started up. We made an agreement that they wouldn't start blasting the pit during while we were waiting between the TRO phone hearing and the preliminary injunction hearing in Reno at the end of January. But as soon as that preliminary injunction was denied by the district judge, it's gone. It's full bore. Okay. Now, it is going to be completed when? Well, the construction, if you look in the EIS, the schedule is essentially a year or so of that. And then construction and development is sort of merged together. They want immediate development of the mine pit. They need ore production, they said. So all of this ground clearing and construction is ongoing. A lot's already been done. They went in there with their, if you talk to the Western Shoshone elders who are here today, they went in with their fleet of bulldozers within hours of the denial of the preliminary injunction. This is a massive project, and they're spending over 600 and some-odd thousand dollars a day around the clock for months and months and months. And they will continue to do that. And that damage is ongoing. Well, are you suggesting it's so far along that the question of an injunction pending appeal is moved? No. That's, I think, what Barrett no, I certainly don't feel that way. I think Barrett is arguing that each day they're building the facilities more. They're going to start digging into the mine pit. They might have started already. It's hard to tell. There's a security fence and security personnel preventing people from accessing. It's actually an active mine zone. It's very dangerous. So the religious views, we only, not only have irreparable harm to the environment, we have religious practices that are being denied daily. And we think under the Supreme Court and Ninth Circuit case law, I think, Judge Tashima, you were on a case recently dealing with denial of, it wasn't a religious, it was a First Amendment and statutory case, but denial of religious practices is irreparable harm. What is the statutory hook for that at this point? The RLUIPA issue is off the table, as I understand it. Right. So what we're looking at, see if I can reproduce and you can tell me whether I've got it right, is the undue impacts, the undue degradation standard, which, as I understand it, applies here if there's a violation of some other statute. Well, that's the key statutory interpretation issue, and I wanted to talk about that. We have irreparable harm. And then we, I think that because we understand the impact to the local economy if the injunction was issued, no one's denying that. These are good jobs. The problem is, the likelihood of the jobs now are just construction jobs. Well, they're construction jobs, but I think an embarrassed attorney may have a better answer than me, but they merge into mining jobs. They're mostly heavy equipment operators that are blasting and digging the roads and clearing the ground and stuff like that. Okay. So to certainly the Western Shoshones who are now precluded from accessing the construction of a mine and the actual pouring of the gold ingot in a year or two, it doesn't matter to them. This site is irrevocably destroyed, essentially. The statutory question I thought they did have access under the Well, that's one of the issues where we disagree with BLM and Barrick. I mean, they have physical access to the top of the mountain and to the White Cliffs and so on. Well, the White Cliffs are really sheer. You can't access them. As the testimony in the record from the various submittals by the tribal governments and individuals, as well as the testimony at the P.I. hearing, members here today testified that they access the site, the very site where the project is. Other Western Shoshone will access other areas. But essentially, destroying one part of the church is greatly harming to someone's religious beliefs. The fact that another part of the church is not being part of this project is not, we don't think, hurts us. Okay. How about the statute? Yeah. The statute is the Federal Land Policy Management Act, and it says the agency, the BLM, the Interior Department, shall prevent undue degradation. Now, BLM's statutory view here is that that's a meaningless phrase. Unless there's some other violation, Clean Air Act, Endangered Species Act, case, you know, statutes this Court is very familiar with, we can't say no. Essentially, they're taking a congressional statute, which I think the key case is the Mineral Policy Center case, because the Interior Department, the Clinton administration had issued a legal ruling that said the Interior Department has to deny a mine that will cause substantial irreparable harm to a significant piece of land. This is a regulation, not a statute, isn't it? Well, no. Statute, the undue degradation requirement is in Flipman. It's a statute, but this is a regulation. And then there's regulations. I was lead counsel in that Mineral Policy Center case. And what the Bush administration had come in and says, no, we do not have the legal authority to prevent undue degradation unless another law is violated. And we argued to the district court, well, that means Flipman doesn't mean anything because, you know, let's do one of the Clean Air Act or something like that. The district court agreed with us and said, no, BLM has actually the duty to deny these substantially irreparably harming mines to significant resources. Interestingly, the court didn't overturn the new regulations, but if you look at the government briefs that we submitted in our supplemental excerpts of record, time and time again the Interior Department tells the district court under the current regulations we will deny a mine under the undue degradation standard if there's substantial irreparable harm to a significant cultural and environmental resources. We cited page after page. That was BLM's policy to the district court. Now they're saying, they're sort of going back to the discredited and rejected view that the district court rejected, saying we have no authority. We can't deny a mine unless there's some other violation. Well, that takes the heart of Flipman that the district court and Mineral Policy Center said superseded U.S. mining laws, that essentially it makes it a nullity. And we don't think that's the proper interpretation of Flipman. And we had cited, you know, the sort of standard administrative law that agencies just can't make up new interpretations of the law. We also showed that the BLM official, the BLM office in this case, in 150 mining and exploration projects in his 13 or so years, never denied a single one, ever. So what's happening is the BLM in Nevada takes the view that Flipman really doesn't mean anything. We can't deny mines. Go find an endangered species somewhere. And if you look at the statements of the district court from the Interior Department, they specifically say we're going to apply the undue degradation standard, particularly for resource, to protect resources that are not protected by other laws like endangered species, and they particularly mention Native American cultural sites. So we think there's the statutory issue that clearly we have a likelihood of success of the merits. The other thing wrong with the BLM's decision was it's classic administrative law. Their decision on no undue degradation was based, they flat out said, there will be no Western Shoshone, there are no Western Shoshone religious practices at the mine site, and none will be adversely affected. They made this determination when they printed the draft EIS. Then the tribes submitted all of their comments, the individuals submitted declarations, all saying, what are you talking about? That's where we go to pray, at the mine site. And BLM, the final EIS really didn't change from the draft EIS, and they said, they stuck to their position, no Western Shoshone uses at the site. That's classic arbitrary and capricious decision making. We understand the deference that's given to agencies in these matters, but when they just flat out ignore the record, resolutions, comment letters from numerous Western Shoshone tribes, 10 or more individuals saying, this is where we pray, what do you mean this is not going to impact our religion? That we don't pray there. Essentially, BLM's- I must say that I did not understand from your briefs that you are attacking or challenging the basic interpretation of the undue degradation standard. Yeah, it's particularly in our reply brief when we talk about the inconsistency with the Interior Department's policy as stated to the District Court and Mineral Policy Center. Probably after the first introductory pages, probably start on pages three or four, I can give you my, the site on rebuttal. But it's, that's where we start talking about the BLM's position that essentially Flipna's meaningless, we can't do anything. That that's contradicted by their own policy and statements to the District Court. So we have the statutory issue, and then there's essentially, they received all this evidence, they consulted with the tribes. You know, we're actually waiting for a decision from the Ninth Circuit on an exploration project that BLM and Barrett, BLM approved for Barrett on the other side of Mount Danabo, where we're challenging the lack of consultation with the Western Shoshone tribes. We're not challenging the lack of consultation here. BLM consulted with the tribes. The tribes gave them their information about the significance of these religious practices. And BLM basically said, religious practices? What religious practices? We don't see any. And we think that's- I didn't understand what you're saying. As I read the Environmental Impact Statement, they seem to agree that this had religious significance and that there were religious practices. The mine is saying that that isn't so, but they seem to agree that there was. I didn't- Well, they say that they can go elsewhere to pray at the top of the mountain. You mean they can go to the top of the mountain? Is that what you're saying? Yeah, and stuff like that. If you read, we cited in both our opening and reply briefs, the statement from the BLM-ELS repeated in their briefs that there were no Western Shoshone religious uses at the site. That's been they stated that numerous times. Could you just say a word before you sit down about the NEPA claim? Yes. Thank you, Your Honor. One of the big issues was this PM 2.5. Sounds arcane, but it's a very harmful criteria pollutant in the Clean Air Act. And we argued in the comments, where is your analysis of PM 2.5? No analysis in the final EIS. All they said was, well, we meet the standard. Here's the standard. And we said, what's your support? It was a one-liner in the comments section of the EIS. Oh, PM 2.5 is 15% of PM 10. That was it. We challenged that. In the district court, the Justice Department added some outdated and now superseded EPA memo saying that that's a fine practice and all this stuff. And we're like, wait a minute. Classic administrative laws, the decision has to be based on the record. They can't add justifications essentially six months later in the district court. And I think that's the heart of the NIEP issues. There's also the water mitigation and stuff. We think that, I only have a few seconds left. I'd like to save a little time unless there's questions in this round.  Thank you. Thank you very much. May it please the court. Sam Sankar representing the United States government in this case. The district court conducted a four-day evidentiary hearing in this matter. And after that hearing, refused to issue the preliminary injunction that the plaintiffs seek. Plaintiffs haven't done anything to suggest that the district court abused its discretion in denying that injunction. Plaintiffs argue basically that BLM violated two statutes here, FLTMA and NEPA. With respect to FLTMA, what the plaintiffs are saying is, in essence, that the existence of the mind, the expansion of the mind, violates their religious beliefs. That may have constituted. I can't hear you. I'm sorry. Violates what? Essentially saying that it violates their religious beliefs. And that may have constituted a viable RFRA claim, or at least, you know, might have met the pleading standards for a RFRA claim. Well, as I understand what they're saying in a slightly higher level of abstraction now that I understand it, and it does seem to be in the briefs, is that the government's position that the undue degradation standard only encompasses violations of other statutes and doesn't have any independent content is wrong. That's incorrect. That's what Mr. Flynn is suggesting, and he said that repeatedly in his briefs. And I'd suggest that if you look at the regulations, the BLM's mining regulations, among other things, well, actually, here's a very specific example. As you know, NEPA is a procedural statute, and it doesn't require the implementation, for example, of any mitigation requirements that are discussed in an EIS. But in this case, BLM said, here's your plan of mining operations. We're requiring that you adopt all these mitigation approaches that we've specified in the EIS. We're required ñ NEPA doesn't require that. The Clean Water Act doesn't require it. That's different, as I understand it. I mean, in general, FLIPA, FLIPA, however it's said, does have ñ requires that the plans be set up and that they be followed. But in the course of determining the plan, there seems to be a particular standard with regard to, quote, undue degradation of cultural, and I gather that includes religious ñ What the plaintiffs are saying is that it incorporates Executive Order 13-XXC. Well, they're partly saying that, but I think they're saying more generally, as now that I understand it, that it doesn't really have to be based on any particular statute, that it has to be based on whether there is a significant irreparable harm, and that that was the prior ñ In fact, the plaintiffs are incorrect in this respect. The substantial irreparable harm standard ñ they're frankly just misstating the law on this point. That is the specific part that was removed in the 2001 regulations. And if you look at the Mineral Policy Center decision ñ But they're saying you weren't entitled to ñ all I'm saying is that there is a legal issue here, a specific legal issue, about what the meaning of the undue degradation is. And if they were right about their legal issue, then it hasn't been addressed and there would have to be a renewal. I agree that if they are correct that the substantial irreparable harm standard as it existed in 2000 after the Clinton regs were put in place still exists, then, yes, there is a legal issue here. But I think that the ñ and I do want to step back a little bit because, you know, I'm dividing time with the interveners and talk about the merits of some of the religious claims. This ñ first of all, the Court should recognize that even though the district court took a lot of testimony from a lot of people, that ñ all that testimony is relevant only with respect to the RFRA claim. Otherwise, the FLTMA and NEPA claims are ñ are evaluated on the administrative record and the administrative record alone. And plaintiffs, while they've cited a lot of very general statements in the administrative record about, you know, using the entire Mount Tanabo area and the entire area being sacred, the only specific uses that were identified that BLM ñ you know, BLM went out and tried to find out where things were being used and tried to protect those uses. And designated areas, instead, the top of Mount Tanabo, the White Cliffs area, Horse Canyon, these are areas that we see a consistent pattern of use. And these are areas that we are essentially excluding from development. Counsel for the ñ for the mine can probably describe the size of those areas more appropriately than I ñ than I can. But they're ñ they're quite extensive. And the fact that BLM did that shows that it was not simply saying UUD means nothing. It was going out there and doing things that it was not required to under other law. Let's be clear. The National Historic Preservation Act, for example, does not mandate that. It doesn't. So that's why I'd like to know whether, supposing they had ñ the facts were as they are represented by the plaintiffs, and that you agreed with those facts, would the agency have any responsibility slash authority to deny the permit on that basis? Your Honor, I apologize. I'm going to have to ask you to clarify which ñ which facts. Facts with regard to the use ñ the religious use of the whole area as opposed to just a part of it. I think if they were ñ if it were correct that there was religious use in the entire area, identified specific religious use areas, for example, I think BLM would certainly have to look and see whether the degradation to those religious uses would be undue or unnecessary under the standard. Look, meaning consider, as opposed to having a substantive obligation? Well, I think it has a substantive obligation. But I think that, you know, it's ñ it's not a black-and-white standard. So considerate ñ so you'd have to actually say, look, here's ñ here's the impact. Describe what they are. And under administrative law, make a ñ engage in a rational process of examining whether those are significant or insignificant. But you're not arguing, therefore, that it's a purely procedural statute? Oh, absolutely not, Your Honor. Or that it's total ñ it's entirely encompassed by other statutes? To the extent that I'm ñ It has some independent role. Yes, absolutely. And to the extent that I've been trying ñ I have not been intentionally working around making that statement. If that's what you're asking, absolutely. And I think, as a perfect example, if you look at the regulations, 3809.420, talks in very specific detail. It says, you know, you have to reduce your impacts on water as much as practicable. That's above and beyond the Clean Water Act standard, for example. And the EIS is shot through with all kinds of requirements that the mine operator take specific actions to do these things. And I submit to you that those specific actions are not required by any other law. They're ñ they're ñ they're requirements imposed by Barrick in this case. But you don't think that the substantial irreparable harm standard is the standard? No, absolutely not, Your Honor. Again, that was a specific term inserted in year 2000. So what does undue degradation mean? You know, it is not ñ Congress didn't define it. BLM has explained in its regs what it means. And ñ But it hasn't, it sounds like. I think it has. If you look at 3809 ñ again, I commend 3809.420 to you. And there's ñ there's an earlier definitional statute that essentially provides the same stuff. It says not just that you have to comply with existing laws, for example. It says you have to rehabilitate areas after you're done. That ñ that requirement doesn't exist in other law. It is something that BLM is enforcing through the FLTMA regulations ñ I'm sorry, the UD regulations here. And it does say things that are ñ go above and beyond. And again, I want to be clear that ñ Well, the actual definition of unnecessary or undue degradation is it doesn't comply with other statutes, essentially, isn't reasonably incident to prospecting, mining, or processing, which I understand to mean something else. It means that you can't, you know, make a bigger mess than you have to. But that's a different issue. And not, again, a reference to specific statutes. I don't see that as defined any ñ It also says in accordance with an existing plan of operations. And that's ñ that is where BLM exercises that case-by-case discretion. It says we're ñ it's ñ you know, mine sites are not uniform. There's a million different kinds of mine sites. But it means that there's no standard for the plan. There's no standard that says that the plan has to be set up with any content with regard to the undue degradation, the way this thing is written. Now, we're being told that you're not really applying it that way, but you are in this case. Well, this is an ñ this is an as-applied case. You know, the plaintiffs ñ counsel for the plaintiffs appeared in the Mineral Policy Center case, and that case upheld the regulations on the case. This is not a challenge to the regulations. This is a challenge to the specific content. So where in this definition would your representation that there is substantive content to undue degradation, although the substantive content isn't substantial irreparable harm, where ñ what is that substantive content, or where is it in this case? Are you looking at 3809.415? Yeah. All right. So the very first one, A, it says you have to comply with 3809.420. I'm just going to pick one ñ 3809.420B gives a list of specific standards. For example, B3 says at the earliest possible time you have to reclaim the area disturbed. B3-2 says reclamation shall include the following things. It has air quality. It has water quality. These are specific standards, and these go beyond the requirements of other existing law. So I ñ if Your Honor's concern is that the BLM ñ it's clear that the plaintiff's concern is that BLM is writing UUD out of this. The government's position with respect to this, number one, is on the administrative record. On the administrative record, there's nothing to support specific religious uses that ñ within the project site, BLM did do its consultation with the tribes, did try to find out where the religious uses were, and ñ and separated those areas. And on the ñ on the legal hook part of it, the only legal hook that the plaintiffs have identified is this Executive Order 1309 ñ or 13009. Our brief talks a little bit about why that's not applicable here, because it only protects specific sites. I do want to save some time for the ñ the Mines attorney to present some questions. May it please the Court, Francis Wickstrom appearing on behalf of Derek Cortez. Your Honor, how much time do I have? Four minutes and 25 seconds. I was hoping to speak at length about the public interest, because the Supreme Court is not the main focus of the courts in situations like this, but I'd like to add a little bit on this UUD standard in light of the Court's questions. The statute, FLTMA, says the court shall by ñ the agency shall by regulation or otherwise. We've talked about the regulations counsel did. What was the otherwise in this case? The standard is, did BLM act arbitrarily and capriciously when they concluded that there were no religious uses in the area where the project is, not the whole area? And that's one of the problems, is that the way that the appellants define the Mount Sinabo sacred area, it has all of Mount Sinabo, all of this area where the project is, parts of Crescent Valley which are unspecified, parts of Grass Valley which are unspecified, and Shoshone Wells, which is over here on the upslope of the opposite mountains. But BLM didn't stop there. They asked during their consultations, well, where do you worship, what do you do, who does it, and they got no answers. And it's really not appropriate for appellants to basically sandbag the process by saying we're not telling you, and then criticize the agency for not respecting their so-called religious uses. When you say they got no answers, where do we look in the administrative record to find that? In the EIS itself, Your Honor, and I can't give you the exact page, but they said that the Western Shoshone declined to say, the EIS states at 3.9-25, that's a page. However, because 3.9-25, quote, however, because Western Shoshone consultants have not disclosed the number of people who visit the mountain for spiritual or religious use, and the frequency and the specific location of their visits to the mountain can't be quantified. But what BLM knew is they did an extensive archaeological study of this whole area. They had archaeologists walk every foot of it, and they found no evidence of religious use. They knew that this entire area where the pit is located now was basically checkerboarded with drill pads and roads and other facilities, and that those people had not seen anybody attempting to worship in the area where the actual project is being built. They did apply all of these other factors. They knew the history of this area, that this entire pediment area where the mine pit is now was completely deforested by the turn of the 19th century. There was a town site there with 500 people living there, and all of this, BLM did what the district court had to do, take all of the evidence into account. Appellants just want you to listen to their most favorable evidence and essentially do a do-over on the agency and a do-over on what the district court did. And you're not talking about certain areas of the project. I couldn't tell whether you're saying that nobody uses this mountain at all for religious purposes or you're saying that it doesn't use certain areas of it. They don't use the areas where the actual project is being constructed, Your Honor. There is some evidence that at the top of Mount Tenobo in a mill canyon and horse canyon that there were pine nut gathering and things like that going on. And that has occurred definitely. So in my final minute, I want to say with respect to the public interest, Judge Hicks found, and the appellants did not point out where Judge Hicks abused his discretion, that the public interest in this project going forward was, to use his words, huge. He said he was awestruck by the impact of this project. It's pumping literally millions of dollars, hundreds of millions of dollars into the northern Nevada economy at the time that that economy is struggling mightily. There are presently approximately 600 people working on the site. 300 of those are working for the 50 contractors that are helping to construct the mines, the roads, and the facilities, the buildings, and the crushers. The others are actually engaged in mining. I understand it's all on the record, but the district court made no finding on the public interest issue, did it? Your Honor, in both his order that, you know, addresses that requirement of winter. The written order supplemented the oral order that he made, and if you read the transcript of that, Your Honor, you will see that he does discuss what he calls the awesome, I believe, impact, economic impact of this project. Well, that's not public interest. It's not the only factor that weighs into public interest. That's correct. That's the problem, so to say, well, this is really good for the economy. You can say that about every major project. That's correct, Your Honor. The public interest has to include everything. But I would note that, based on the record, there will be more western Shoshone individuals that will lose their jobs than the number of western Shoshone individuals that came forward and said this was a sacred area in the process. They have to decide that for themselves. Okay, thank you. One minute. Just a few points. First on the UUD degradation, if you turn to our reply brief at page four, this is the statement from the Interior Department to the District Court Mineral Policy Center, that we would exercise our case-by-case control over specific mining operations reinstated in the 2001 rule, the current rule, and we would prevent unnecessary underdegradation and prevent irreparable harm to significant scientific, cultural, or environmental resource values. That's their policy. That's their statement to the District Court. That's how they interpret FLIPMA in Washington. Out here in Nevada, we never deny a mine. We will basically say, show us another law, but we're not going to prevent harm to significant cultural and environmental resources. But there is, it appears, a set of substantive FLIPMA requirements that proceed in that same section, which I don't have in front of me, but I gather they're significant. Well, the FLIPMA is a really one sentence that says prevent undue. I mean the regulations. The regulations are pretty vague. The court upheld the regulations, but based on the commitment from Interior in the briefs, and we attached them all to our supplemental excerpts, says we will prevent undue degradation to significant cultural resources. Here we've got, excuse me, prevent irreparable harm. Well, are you or aren't you making a facial attack on that regulation? Oh, no, it's an as-applied challenge. The facial challenge was back in 2001. The court came out in 2003. But Interior said we will prevent harm to these significant cultural resources. I don't know what that means. In making our decision, do we consider or we don't consider whether the way in which the agency is implementing this regulation is valid? The regulation and the statute. I think that's certainly within your authority under your APA review to look at whether the agency misconceived the law here, and the law and their own commitments that they're going to prevent this harm. At least the way they're interpreting in this case. Right. And if I could just have 20 seconds on just some citations to some of the other issues, if possible. No, but if you want to provide some supplemental citations, you can. Oh, okay. I'm just going to point to the pieces. It's more than if happens to be a public matter. Okay. Thank you. Thank you very much. The case just argued is submitted for decision.
judges: Schroeder, Tashima, Berzon